Ms. Morrissey? Yes, Your Honor. May it please the Court, Tara Morrissey for the government. I've requested to reserve three minutes for rebuttal. CMS was not required to promulgate a new regulation to clarify that compensated costs are not uncompensated costs. This policy is an interpretive rule because it explains how to comply with the existing legal duty to calculate uncompensated costs for a particular subset of Medicaid patients. It's also the only interpretation of the regulation that furthers the purpose of the DISH program and that makes sense as a matter of policy. The legal norm at issue here is outlined at page 26 of our opening brief. It describes the Medicaid shortfall or as the 2008 rule states, total Medicaid uncompensated care. So we know at the amount. And that's the shortfall between two things. The costs incurred of treating Medicaid eligible patients and the Medicaid payments received on their behalf. And the purpose of that is to determine how far Medicaid falls short of covering the hospital's otherwise unreimbursed costs. Now when you're dealing with pure Medicaid patients, it's very simple. You plug in the costs and then you plug in the Medicaid payments. But what's not clear is how do states comply with this reporting obligation when hospitals treat Medicaid patients who have third party insurance? Now plaintiffs prior to this litigation did not count those patients at all. But they have recognized that they didn't count them at all as long as there was no Medicaid payment. They've recognized now that those are Medicaid eligible patients. So the costs of those patients have to be considered. So starting from that premise, the question is, does it make sense to, in a calculation of uncompensated costs, to count all of the costs and none of the payments associated with those patients? Plaintiffs say yes. There are no Medicaid payments. And they would ignore the substantial third party payments that they've received. When you say payments, you mean revenues? Revenues or payments from like private insurers, which are at issue here. And so they count all of the upside of counting those patients and allowing them to increase their share of the limited pool of DISH funds available to hospitals in Minnesota. I think the rule, as you say, clearly makes sense. The only question is whether it's a legislative rule or an interpretive one. Isn't that right? There's no question it makes sense. The new rule is now in sync with that. That's correct, Your Honor. These FAQs will affect services rendered through 2017. So even those audits for 2016, for example, will not be conducted until 2019. So there's still a substantial, a real issue here for payments and revenues that have occurred prior to that time. And CMS's position, it said so in the preamble to this very rule in the context of dealing with Medicare patients that, of course, you count the benefits on their behalf because you're calculating an uncompensated amount. Even though your rule makes sense, there are cases in other jurisdictions, are there not that have not gone your way? Unanimously, as far as I . . . So far, Judge Arnold, yes, that's true. But what those cases have done and what the district court did here is they're drawing negative implications from silence in the regulation. They're looking at the regulation and it's very detailed. It must have meant to exclude these types of payments. But as you can see from the outline in our brief, the Medicaid shortfall calculation, which is what's at issue here, is not terribly complicated. It's just costs incurred of treating the patients minus Medicaid payments. And we know from this court's decision in Kindred Hospitals and from other decisions that costs incurred is readily susceptible to an interpretation that nets out offsetting payments. This court interpreted costs, the term incurred, in Kindred Hospitals and said, of course, if payments are offsetting revenues received, that's not a cost that's incurred within the meaning of the Medicare statute. Here isn't a problem. There is an express formula that's set out for how to define that? It's an outline of the calculation. It does say Medicaid payments. But what the other courts and plaintiffs here are doing is inferring that Medicaid payments are the only payments that can be deducted. And that's just not a justifiable inference when, first, we're in the administrative context and we know that that sort of expressio unius argument is weak there. But also, there's just no basis to assume that the agency thought that that calculation would exclude these substantial third-party payments. It specified Medicaid payments because we're talking about a Medicaid shortfall. And so, of course, it would deduct Medicaid payments to see how far short does Medicaid fall and compare that amount in paragraph C-9 against the costs incurred by the hospitals to treat those patients or their otherwise unreimbursed costs to figure out how far short does Medicaid fall. And we know that the negative inference also doesn't make sense because we already know what the agency thought in the preamble to the 2008 rule in the context of Medicare patients, which was the question that was addressing there. The preamble didn't go through the APA process. It didn't, and we're not asking, you know, for this court to treat that as... But in the context of our deference and in the notice and comment process, when courts are trying to figure out what does a rule mean, it is quite proper. You don't look at the preamble, do you? I'm sorry? Ordinarily, one doesn't resort to the preamble, does one, to interpret the rule? It's certainly an indication of the agency's... what the agency thought the rule meant. And as this court said in Advanta, it's the agency's... Then you can't drop in your interpretation into the preamble and avoid the APA. No, but you can interpret ambiguities in the regulation in light of the preamble. And when a court goes so far as here to draw negative implications from regulatory silence, it's quite appropriate to look at the preamble to see if that negative inference was justified. Here the regulation does not explicitly say anything about this subset of Medicaid patients. The purpose of the DISH program is, as we know from the legislation to this limit, is twofold. Congress wanted DISH payments to help hospitals meet the costs of treating Medicaid and uninsured patients without exceeding their net costs, and it wanted to help hospitals that don't have large numbers of privately insured patients. Plaintiff's approach does exactly the opposite. It allows them to exceed the net costs, ignoring these third-party payments that help them meet their costs. And it unfairly advantages hospitals that treat a large number of privately insured patients at the expense of hospitals that treat more Medicaid-only patients who get lower reimbursement rates and whose costs are truly uncompensated. The record here shows that sharing in this limited pool of funds in Minnesota is Abbott Northwestern, which had a $36 million loss in 2013 and received only $168,000 in DISH payments. Meanwhile, the plaintiffs here already started with the surplus and got DISH payments on top of that, further increasing the surplus that they received. That's just not how Congress imposed this limitation to ensure that the DISH payments would be, as a federal matter, allocated appropriately to hospitals that really do have uncompensated costs. Plaintiffs point out that there are some fairness concerns and that hospitals like Abbott Northwestern just are not analogous because these plaintiffs have high Medicaid inpatient utilization rates. But the Medicaid inpatient utilization rate itself accounts for these Medicaid-eligible patients who have third-party insurance. They also— Is the argument that the Secretary is making this before our court different or similar to the argument that the Secretary made in the New Hampshire Hospital case? It's similar, yes, Your Honor. In your correct— The New Hampshire Hospital Association at the First Circuit held that the rule is required to go through notice and comment. I would like to underscore, though, that it agreed with a critical aspect of our analysis, which we think is dispositive under this Court's precedent, which is that it held that the FAQs here are not inconsistent with the 2008 regulation. It said that the regulation is silent as to the proper treatment of third-party payments. And that's exactly the opposite of what the district court held here and what plaintiffs are arguing. We think it follows from that textual silence that there's something to interpret and that the agency has authority to explain how uncompensated costs should be calculated for this subset of patients. We think the First Circuit's analysis was otherwise based on two primary flaws. First, it heavily relied on the assumption that any agency decision that reflects a policy judgment at some level must go through notice and comment. That's not what the Supreme Court said in Guernsey Memorial Hospital. That's not what this Court has said in Iowa League of Cities. It also misunderstood, I think, the explanation provided by the agency in the FAQs and said that it didn't purport to interpret the statute or the regulation. And the FAQs quite clearly begin from the statute and say that the statute does not contain an exclusion for Medicaid patients who have third-party insurance. And it went on from there to say that, so of course you count the costs, and of course you count the payments, applying this principle of parallelism. And then said that the payments must be offset to determine any uncompensated amount, borrowing the precise language that's in the statute and in the regulation. So we think on the whole, the First Circuit's analysis is actually quite helpful when looking at the question that this court posed. Is there a new legal norm or is this an interpretation of an underlying legislative rule, which, by the way, is not binding on the agency. And if a state were to disagree with it, it would go up through the adjudicative process. And that these FAQs would not be binding on the Department Appeals Board in determining what the regulation means. And then that decision would be subject to judicial review. I would like to reserve some time for rebuttal, but if there are further questions. Thank you. Good morning. Is it pronounced Edens? Yes, good morning, your honor. You may proceed. May it please the court, Geraldine Edens on behalf of Minnesota Children's and Gillette Children's Hospitals. I'd like to address a number of the points that counsel for the government just made. First, their whole theory regarding uncompensated costs rests on a very incorrect premise. They are assuming that Medicaid eligible patients, those who are simply eligible for Medicaid, are the same as Medicaid beneficiaries. They are not. This court and many other circuits have recognized that there's a clear difference between being eligible for Medicaid and actually receiving the benefits. And what FAQ 33 here is doing is it's effectively taking revenues earned outside of the Medicaid program, where Medicaid is never billed, they never pay for a single dime of the patient's care. And they're forcing those revenues to be applied against the losses that these hospitals incur. Treating thousands and thousands of Medicaid beneficiaries. You can't turn, as other courts have held, you can't turn an uncompensated cost for one group of patients into a compensated cost by taking revenues from a separate group of patients. The whole notion that these hospitals somehow are getting more than their fair share and that the government's theory, excuse me, the government's theory furthers the purpose of the DISH program is just nonsensical, to be honest. The whole purpose here of this program was that it's a disproportionate share hospital program. It is designed, Congress recognized that those hospitals, like Apelles, who keep their doors open to all Medicaid patients, whether they're eligible or actually beneficiaries, other hospitals view these patients as undesirable. So Congress was trying to ensure that these hospitals essentially run to these patients, open their doors to these patients, that these hospitals can be financially stable and can continue to provide the health care to Medicaid beneficiaries to ensure that they have equal access to health care. The facts of this case demonstrate how FAQ 33 is so harmful to these patients. And I would draw the court's attention to the appellate's appendix page 107, which is one of our declarations where, for Minnesota Children's, it very clearly shows that even when you take into consideration all Medicaid payments, all private insurance payments for these Medicaid, all the whole population of Medicaid eligible, so you take all the Medicaid payments, you take all of the private insurance payments, and the DISH supplemental payments. Minnesota Children's still in 2013 lost $44 million caring for 54,000 Medicaid beneficiaries. Counselor, you're telling us why the hospitals think they're in bad shape, but can you tell us about the legal issues here, about whether this rule's interpretive or legislative? Your Honor, it's legislative for four very specific reasons. First, it has the force and effect of law. You have to remember that the hospital-specific limit came into being enacted in 1993. For 17 years, private insurance payments were never required to be included in the hospital-specific limits. Has this, for 17 years, so when did this first get enforced? Was it with the FAQ 33? Is that the first time that this issue became a live issue? Yes, Your Honor. The FAQ 33 was simply posted on the website in 2010. And when the auditing provisions came in, the states began conducting their audits. And it wasn't until the auditors, where the states were directing the auditors, based on FAQ 33, to actually start including the private insurance payments in the calculation of the hospital-specific limit. So it was not until that occurred that even the hospitals were aware that suddenly there was a new requirement that nobody knew about for 17 years, nobody ever enforced for 17 years. So neither the hospitals conducted their financial reports in that way, nor did the government enforce it. Is that correct? That's correct, Your Honor. It was never required to be enforced. And certainly, the hospital-specific limit was enforced. The Office of Inspector General conducted many audits over that 17-year period of various hospitals. The private insurance issue was never raised. And so it wasn't until these audits, and again, I'd point you to the record, where you actually see a letter from the CMS to the state of Missouri, where Missouri was asking for clarification with respect to FAQ 33 after the preliminary injunction was issued in the Texas children's case. And CMS very clearly directed that while there's an injunction in place for Texas and Washington, all other states must follow FAQ 33. Otherwise, they risk losing their federal financial share. Remember, this is a joint program. So clearly, it has legal force and effect. But even more importantly, what it's doing is that it's stripping the very hospitals that Congress defined as dish hospitals of the supplemental Medicaid funds that they were entitled to receive. And I think although the statutory question is not really before this court, it's really important to understand the program as a whole. The hospital-specific limit is merely the cap. It really sets the ceiling on the amount of dish payments a hospital may receive. But you have to also look at the statute as a whole. And the statute provides a mandate. It says for those hospitals that have these very high Medicaid utilization rates, they are entitled to get some form of dish payment. And in fact, the statute even provides how the states are to calculate the minimum payment that they are to receive. So what the statute does is it creates both a floor and a ceiling. What the government is doing by FAQ 33 is denying the very hospitals that have the largest, they serve the largest Medicaid population in the entire state of Minnesota. And they are essentially wiping out all the rest of the program as Congress intended it to operate. The record shows that without dish funding, a hospital like Minnesota Children's operating revenue drops down to something like 1.3%. They can't operate with a 1.3% operating margin. What does that mean? That means they have to start laying off staff. They have to close programs. They are defeating the very purpose of the dish program, which is to make sure that these very highly specialized services can be provided to the poor and the medically needy. That is what this program is about, and FAQ 33 essentially turns the whole thing on its head. More importantly to your question, Judge Arnold, is the rule is very prescriptive. It very much details out the cost and the payments that are to be included in the calculation of the hospital specific limit. And you don't have to refer to the preamble to interpret that. But even if you do want to look at the preamble like the district court did, you will see from the preamble, it says very clearly that it is not trying to modify in any way the calculation of the hospital specific limit. Numerous courts, district courts have looked at the preamble and reached the same conclusion. The other thing that's really important to see from the preamble is that it refers to an auditing protocol. And that auditing protocol is something that CMS developed to give very precise directions to the states and to the auditors as to how they are to calculate the hospital specific limit. There is absolutely no mention of private insurance payments in that very precise auditing protocol. In fact, the preamble says very specifically that the protocol defines all of the data elements. And those data elements track the statutory language. And this is important. And do not change the calculation of the HSL that should always have been performed. The first circuit- That brings up a question that may not be of particular importance. But I'm wondering why the auditor isn't the proper party to sue here for these purposes. Since it's, you know, I mean, that's what generated this difficulty. No, Your Honor. This is a federal policy. The way the Medicaid program works is a joint- But I mean, it was his interpretation. It's not his interpretation. All they are doing in the auditor's- I'm sorry, the auditor's interpretation is what caused this, right? No, Your Honor. It's CMS's interpretation- I'm sorry? No, it's CMS's. It's the government's interpretation through FAQ 33 that is driving the state's- I understand that, okay. So no, the auditor is not the proper party. In fact, the only remedy the hospitals here have is with the federal government. Because the states essentially say their hands are tied. They are compelled to follow federal policy, including FAQ 33. Otherwise, they- Not if it's not legal. Pardon me? Not if it's not legal. It's- And you're saying it isn't. It's not legal, but the states- Okay, never mind. This is not a, it's not a, nobody cares but me, so go on. No, no, that's not at all, Your Honor. The point is, the guidance, and this is where you cross this line between, you know, substantive, the interpretive versus legislative rules. So, obviously, it's not a bright line. But here what you have is exactly what Iowa City is cautioned against, is you have guidance being basically solidified as if it has the force and effect of law, because it's being very clearly directed and made clear that the states need to follow this, or they're going to risk losing their financial share. And in fact, this case is very, very similar to the facts in Iowa City, because there, there you had a prior policy, the prior policy that was in place did not prohibit the use of certain technologies, and then EPA suddenly issued a letter in 2011 that mandated that they couldn't use certain technologies. And that's exactly what's happened here. The prior policy never included private insurance payments. There's no mention of private insurance payments anywhere. Even in the preamble, it doesn't say private insurance payments. They're talking about a different concept of due eligibles. And so, then FAQ 33 comes along and says, yes, you do have to include private insurance payments. The point is, even if, even if you want to assume, give the government all the benefit of the doubt that you want, as the First Circuit did. Even if you assume somehow in the preamble, the government was, the government is signaling their intent that private insurance payments somehow should be included in the calculation of the hospital specific limit. They still didn't do it in accordance with the APA. The preamble itself is not notice and comment rule making. It, it, it's a substantive change to, to that actually expands the footprint of the regulations here. But I think the most important point I'd like to leave the court with, as my time is almost up, is we just need to really understand the purpose of this program. And when you have two hospitals that serve more Medicaid beneficiaries than any other hospital in the state of Florida, state of Minnesota, I'm sorry. The state of Minnesota. And that somehow the government believes that they're getting too much, too much, too much money from the DISH program. And that money somehow should be given to a hospital like Abbott Northwestern. Just doesn't make sense. You can see, and I would point the court again to our appendix in on page, sorry, on page AA84 where it contains a list of all of the DISH hospitals in the state of Minnesota. And it ranks them according to the way the statute asks you to categorize them. And what you see is children's, Minnesota Children's and Gillette Children's, is at the very top of the list because they have a Medicaid utilization rate of 66%. Abbott is the second to the last hospital on this list in order of ranking because they only have 16% Medicaid patients. Why? They're an adult hospital. They're an adult hospital that relies mostly on Medicare, not Medicaid. They get Medicare DISH payments as something to the tune of $13 million. But yet the government thinks you should take the money from two children's hospitals that any other in the state, and somehow that money should be redistributed to a hospital like Northwestern who has a 16% Medicaid utilization rate. That simply is not the way Congress intended this program to work. We thank you for your argument. The honors, I have two points to make on rebuttal. To Judge Kelly's question about when did all of this become an issue, of course you know that CMS was first asked about this in 2008 as part of the notice and comment rulemaking, and then addressed it in 2010 in the FAQs. But I'd like to note that the audits, the first audits that states were required to submit did not happen until 2009, and the first time that the payments would ever be, overpayments would ever be recouped, was not until 2014 when the audits were done for fiscal year 2011. So while the limit was initially enacted in 2003, sorry, 93, and then the reporting requirement was not enacted by Congress until 2003. So we see the audits coming at a much later date, and it wasn't until litigation based on the 2011 fiscal year that we started seeing this issue come to the forefront. Is it your position that there wasn't an opportunity to enforce this because of the way the reporting requirements came about? Certainly the government would not have been requiring any overpayments to be recouped until it saw the audits for fiscal year 2011, which would have happened in 2014. That's when the audits would have been released for 2011. So we don't actually have specific knowledge of what states were doing prior to when we started to receive the audits. And we do know on this record that plaintiffs were not counting the costs or the payments for these patients. So there obviously was an ambiguity. They now want to count the costs and not the payments. There was an ambiguity as to how to handle these types of patients, and there was a need for interpretation. I may have not gotten the argument correct that your opponent was raising, but isn't the set-off rule a substantive in effect? No, Your Honor. It's an interpretation of a 2008 regulation. The effect of it is to cost the hospitals a lot of money. It has a practical impact, Your Honor, and most interpretive rules do. Call it substantive, call it a practical effect? The First Circuit and Warder and other courts have recognized that every interpretation is designed to give public notice, and that's going to have some practical effect. The real question is, does it have an independent legal effect? And here the answer is no. If CMS wanted to, if a state said, we're not counting third-party payments, and say you take the FAQs completely off the books, and the state said we have these third-party payments, we're not sure what to do, and we haven't included them in our audit, but we know we're supposed to report on compensated costs, CMS would then have, I'm sorry, may I conclude the sentence? CMS would then have authority to say we disagree with that interpretation, and the state could take that up through the administrative process, and the Departmental Appeals Board would have authority to decide whether or not that was an appropriate interpretation of a regulation that requires reporting of uncompensated costs, or whether compensated costs can actually be included in uncompensated costs, as plaintiffs have argued. Is that it? I didn't say what I was going to say, so we thank you for your argument. We'd ask the Court to reverse. Thank you. Thank you.